**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **ALVIN CAMPBELL** | ) | |
| | ) | |
| Plaintiff, | ) | No. 12 C 1165 |
| | ) | |
| v. | ) | |
| | ) | Judge Elaine E. Bucklo |
| **THE CITY OF CHICAGO** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**1

Plaintiff Alvin Campbell filed a one-count complaint against defendant the City of Chicago alleging that defendant retaliated against him in violation of 42 U.S.C. § 1981. Defendant moves for summary judgment, and for the following reasons that motion is denied.

I.

Alvin Campbell has been a police officer for the Chicago Police Department's 18th District for approximately twelve years. Prior to the assignment that is the impetus for this litigation, Campbell worked as a relief pool officer.

The Chicago Police Department ("CPD") and the Chicago Housing Authority ("CHA") have an inter-governmental agreement requiring CPD to provide dedicated police service to CHA properties in need of additional police assistance. In an effort to mitigate violence across Chicago's public housing, CPD implemented a CHA Initiative, and on April 10, 2009, pursuant to

1

that Initiative, the 2nd Watch of the 18th District was directed to assign two police officers to a fixed post located at 364 and 365 West Oak, at the time part of the Cabrini Green housing project. The purpose of this new assignment was to assist the private security personnel at the two buildings and generally to provide a constant police presence in and around the buildings. This new "beat" assignment was designated as "Beat 1822F," and it was implemented on April 11, 2009.

As a "fixed post," Beat 1822F required officers to obtain face-to-face relief at all times, including for lunch and personal breaks. This meant that the officers assigned to the beat could not leave the post until other officers physically came to the post to relieve them. It became known to at least some of the officers in the 18th District as "the punishment car." The decision regarding who to assign to Beat 1822F on a day-to-day basis was made by the Watch Commander. The CPD is organized into districts, and each district is headed by a District Commander. Each district is further organized into three watches, supervised by a Watch Commander. The Watch Commander reports to the District Commander.

At the time of the inception of Beat 1822F, the Watch Commander for the 2nd Watch was Captain Randall Zawis ("Zawis"). When Zawis was on medical leave between May 2009 and November 2009, Lieutenant Paul Mack ("Mack") was the Acting Watch Commander for the 2nd Watch. In April 2009, the District

2

Commander was Deputy Chief Steve Georgas ("Georgas"). Georgas was replaced by Kenneth Angarone ("Angarone") in August 2009. The Watch Commander had discretion to make assignments on a day-to-day basis, but was accountable to the District Commander.

On April 11, 2009, the day of its implementation, plaintiff was assigned to Beat 1822F. Plaintiff was also assigned to the beat on April 17. On April 24, Beat 1822F became plaintiff's regular assignment, an assignment he shared with Officer Brian Corcoran ("Corcoran") after that date. Plaintiff worked the beat for approximately nine months.

On April 11, 2009, the same day plaintiff was assigned to Beat 1822F with Officer Alvin Greenup ("Greenup"), Greenup told plaintiff that Sargent Kelly Braithwaite ("Brathwaite"), a supervising sergeant, referred to plaintiff as a "miserable fuck." In response to an exchange Braithwaite had with Campbell in the parking lot of the 18th District, Braithwaite asked Greenup: "How do you work with that miserable fuck?" Then around April 13, 2009, Corcoran told plaintiff that Braithwaite had referred to plaintiff as a "fat lazy nigger."

That same day, plaintiff went to speak with Zawis. He requested to speak with the Watch Commander "off the record" but Zawis informed Campbell that Zawis would be obligated to report anything serious. After a general conversation about plaintiff not wanting to work under Braithwaite's supervision, plaintiff reported Braithwaite's remarks to Zawis. Plaintiff also told

3

Zawis that several weeks earlier he had overheard Braithwaite refer to Corcoran and another officer as "Irish pieces of shit." After plaintiff left his office, Zawis called the Independent Police Review Authority ("IPRA") and obtained a log number to initiate a formal complaint. Zawis also prepared a Complaint Register ("CR") Initiation Report. Plaintiff was named as the complainant in the IPRA investigation and in a memo from Zawis to Georgas.

Plaintiff's claims of retaliation stem from the initiation of the investigation into Braithwaite's comments. According to plaintiff, he and Corcoran were subject to "intentional, severe, and humiliating retaliatory action" by Zawis, Braithwaite, Sargent Brian Byrne ("Byrne"), and Georgas, among others. Primarily, plaintiff alleges that Zawis assigned him and Corcoran to Beat 1822F on a permanent basis as "punishment," due to the location and the restrictive nature of the assignment. According to plaintiff, certain aspects of Beat 1822F became more restrictive over time. During the summer of 2009, the beat temporarily was changed from a car assignment to a foot post. In January 2010, restrictions were placed on the Beat 1822F car regarding how officers could refill the gas tank or obtain car washes. Plaintiff also received two Summary Punishment Action Responses ("SPARs") during the summer of 2009, one of which was expunged by Angarone.

Plaintiff, Corcoran, and a number of other officers were

questioned as part of the IPRA investigation into Braithwaite's comments. During their interviews, both plaintiff and Corcoran stated that they believed they were being retaliated against in response to the initiation of the investigation. The IPRA investigation concluded with a finding that Braithwaite had acted unprofessionally when she called plaintiff a "miserable fuck," but other allegations against her were dismissed. The IPRA investigation also found that Corcoran had failed to report the racial slur he allegedly overheard from Braithwaite. Greenup was also cited for misstating Braithwaite's comments. The IPRA investigation did not make any findings regarding the allegations of retaliation.

## II.

Summary judgment is granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view all facts and reasonable inferences in the light most favorable to the nonmoving party. *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 683 (7th Cir. 2010). However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505 (1986).

## III.

Section 1981 prohibits race-based discrimination in "the

5

making, performance, modification, and termination of contracts." 42 U.S.C. § 1981. Litigants often "invoke § 1981 to assert their rights to be free from discrimination while making and enforcing employment contracts." *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006). "The Supreme Court has held that § 1981 authorizes claims for retaliation, if one person takes action against another for asserting the right to substantive contractual equality provided by § 1981." *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012) ("*Bray*") (citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445, 128 S.Ct. 1951 (2008)). "[U]nlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination." *Id.* (citation omitted). "The substantive standards and methods of proof that apply to claims of racial discrimination and retaliation under Title VII also apply to claims under § 1981." *Id.*

Plaintiff argues that he has presented sufficient evidence of retaliation under both the direct and indirect methods of proof, but because I have determined that plaintiff has presented enough evidence under the direct method, I will discuss only the direct method. To avoid summary judgment under the direct method, plaintiff "must present direct evidence of (1) his statutorily protected activity; (2) a materially adverse action taken by [defendant]; and (3) a causal connection between the two." *Bray*, 681 F.3d at 896 (citing *Coleman v. Donahoe*, 667 F.3d

835, 859 (7th Cir. 2012)).

The evidence demonstrates that plaintiff has raised genuine disputes of material fact relating to all three prongs of the direct method test. The record reveals that plaintiff complained to Zawis, the Watch Commander for the 2nd Watch, about a supervisor's use of racial/ethnic slurs, that the complaint led to a formal investigation, and that plaintiff participated in that investigation. As defendant recognizes, the test is not whether Braithwaite did, in fact, violate § 1981. *See Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 441 (7th Cir. 2010) ("We have repeatedly held that a plaintiff need not prevail on her Title VII discrimination claim or have opposed an action that in fact violated Title VII to win a retaliation claim.") Instead, plaintiff need only present evidence that he "reasonably believed in good faith that the practice [he] opposed violated Title VII." *Id.* (internal quotation marks and citation omitted). Contrary to defendant's argument, plaintiff did not complain about a single or "stray" remark. He complained only after he believed Braithwaite had made two discriminatory remarks, one of which was allegedly used to describe plaintiff. Under an objective "reasonable belief" standard, plaintiff has presented sufficient evidence to create a genuine dispute of material fact.

As for the second prong, an action is "materially adverse" for purposes of claims of retaliation if it "would 'dissuade a reasonable employee from making or supporting a claim of

7

discrimination.'" *Hobbs v. City of Chicago*, 573 F.3d 454, 463 (7th Cir. 2009) (quoting *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 126 S.Ct. 2405 (2006)). In the discrimination context, a "materially adverse" action can include situations in which "the *conditions* in which [an employee] works are changed in a way that subjects him to a humiliated, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment---an alteration that can fairly be characterized as objectively creating a hardship[.]" *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002) (emphasis in original). The record demonstrates that after plaintiff complained to Zawis about Braithwaite, plaintiff and Corcoran were assigned on an on-going basis to Beat 1822F, which some of the evidence suggests was known as the "punishment car." And, among other things, the evidence also suggests that plaintiff and Corcoran's car was taken away from them though they worked in a dangerous area and that the conditions of Beat 1822F became more onerous over time. Plaintiff has carried his burden in presenting evidence that he suffered a materially adverse action.

Finally, plaintiff has submitted sufficient evidence of a causal connection between his allegedly protected activity and the alleged adverse actions to defeat summary judgment. Plaintiff presents evidence that he was not assigned to Beat 1822F on a permanent basis until shortly after complaining about

Braithwaite's comments, that the assignment was known as the "punishment car," and that the requests of other officers to be taken off of Beat 1822F were accommodated by Zawis.  Here, the temporal proximity alone is enough to create a genuine issue of material fact regarding the causal connection between plaintiff's purported protected activity and the allegedly retaliatory actions, but plaintiff has presented more.[1]

Whether plaintiff can hold the City liable for retaliation under *Monell* is a closer question.  Liability in a § 1981 action against a local government is constrained by the remedial provisions of § 1983.  *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733-34, 109 S.Ct. 2702 (1989).  This means that in order to state a claim under § 1981 against a local government entity or municipality, a plaintiff must establish municipal liability under *Monell v. Dept. of Soc. Servs. of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018 (1978).  *See Jett*, 491 U.S. at 735-36, 109 S.Ct. 2702 ("[T]o prevail on his claim for damages against the school district, petitioner must show that the violation of his 'right to make contracts' protected by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases."); *see also Smith v. Chicago Sch. Reform Bd. of Trustees*, 165 F.3d 1142, 1149 (7th Cir. 1999) ("[*Monell*] identifies an element of a plaintiff's claim, so the burden is on the plaintiff

---

[1] In light of the foregoing discussion and considering the record, I also conclude that defendant has not presented enough evidence to prevail on its mixed-motive affirmative defense.

to demonstrate the essential policy or custom.").

"Municipal entities cannot be held vicariously liable for the acts of their employees under Section [1981] on a *respondeat superior* theory." *Phelan v. Cook Cnty.*, 463 F.3d 773, 789 (7th Cir. 2006). "Liability for unauthorized acts is personal; to hold the municipality liable, *Monell* tells us, the agent's action must implement rather than frustrate the government's policy." *Auriemma v. Rice*, 957 F.2d 397, 400 (7th Cir. 1992). To establish municipal liability under *Monell* a plaintiff must produce evidence of "an express policy causing the loss, a widespread practice constituting custom or usage that caused the loss, or causation of the loss by a person with final policymaking authority." *Kujawski v. Bd. of Comm'rs or Bartholomew Cnty, Indiana*, 183 F.3d 734, 737 (7th Cir. 1999) (citation omitted).

Plaintiff asserts that he can establish liability under the second and third methods, but because he has presented evidence to defeat summary judgment on the second method, that is the only method I will discuss. Under the second method, "[i]f the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). This case falls somewhere between the prototypical case, in which a policy has been applied to a number

10

of individuals, and the less common case described in *Phelan*, in which a single series of events directed at one person could, theoretically, demonstrate a widespread policy. *See Phelan*, 463 F.3d at 789. Both plaintiff and Corcoran were assigned on an ongoing basis to Beat 1822F following plaintiff's complaint about Braithwaite, and plaintiff has pointed to evidence showing that the assignment was known afterward as the "punishment car." Still, plaintiff has not presented evidence of retaliation outside of the series of actions directed at plaintiff and Corcoran.

The takeaway from the Seventh Circuit's law on this issue is an "acknowledgment that the word 'widespread' must be taken seriously" and that "what is needed is evidence that there is a true municipal policy at issue, not a random event." *Phelan*, 463 F.3d at 790. Similarly, under *Phelan*, where alleged bad acts are directed at isolated individuals, a plaintiff must still "demonstrate that repeated actions directed at [the plaintiff] truly evince the existence of a policy." *Id*. at 789-90. In short, plaintiff must present evidence that the City acquiesced in Zawis's alleged retaliation to such an extent so as to evince the existence of a "permanent and well settled" policy. *Id.* at 789 (quoting *Roach v. City of Evansville*, 111 F.3d 544, 548 (7th Cir. 1997)).

Plaintiff has met that standard. Unlike the plaintiff in

11

*Phelan*, plaintiff here has presented evidence that the series of unified actions taken against him and Corcoran were part of a municipal policy. The plaintiff in *Phelan* alleged that various co-workers, including at least one supervisor, had sexually harassed her while she was employed in two different units of the same department. She argued that the record showed that various supervisory officials knew of and condoned the harassment, and that this demonstrated the existence of a widespread policy. The Seventh Circuit concluded that she "failed to weave [the] separate incidents [of harassment] together into a cognizable policy. *Phelan*, 463 F.3d 773, 790. By contrast, here, the record suggests that the incidents of retaliation were attributable to the decision of a single individual, Zawis, and that two District Commanders and the IPRA acquiesced in his action.

For instance, there is evidence that the Beat 1822F assignment was used as a "punishment" assignment and that Zawis assigned plaintiff and Corcoran to that beat in retaliation for reporting Braithwaite's comments. Plaintiff and Corcoran repeatedly asked to be taken off of the Beat 1822F assignment but were refused by their superiors, including Georgas (who was the District Commander and to whom Zawis reported). And though plaintiff and Corcoran complained to Angarone (who had by then taken over as District Commander) that they were assigned to Beat 1822F by Zawis as a punishment, Angarone refused to take them off

of the assignment.  Further, the record demonstrates that both plaintiff and Corcoran reported the alleged retaliation to IPRA investigators, but the IPRA never made any findings regarding the reported retaliation.  A reasonable jury could conclude from the evidence that those complaints were ignored.  There is therefore evidence suggesting that two District Commanders and the IPRA acquiesced in Zawis's allegedly retaliatory assignment of plaintiff and Corcoran to Beat 1822F.  This evidence, alone, raises an issue for trial as to whether there was "a true municipal policy" of retaliation.

Additionally, the record demonstrates that the subsequent actions of Zawis, Georgas, and multiple supervisory officers placed restrictions on the plaintiff and Corcoran's assignments that made Beat 1822F more onerous and, arguably, dangerous over time.  Whether each of these actions was retaliatory is, as I have already determined, an issue for trial.  If a jury determines that the additional restrictions and punitive actions were retaliatory, a jury could also conclude that these actions were taken as part of a widespread policy.

## IV.

For the foregoing reasons, defendant's motion for summary judgment is denied.

Date:  August 21, 2009

Hon. Elaine E. Bucklo, US District Judge

13